UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ANDREW GEOGHAN,

                             Plaintiff,

       - against -

LONG ISLAND RAIL ROAD,

                           Defendant.
-------------------------------------------------------------X

**MEMORANDUM
AND ORDER**

06 CV 1435 (CLP)

      Plaintiff Andrew Geoghan filed this action on March 29, 2006 against his former

employer, defendant Long Island Rail Road ("LIRR"), alleging that his termination was in

violation of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, the New

York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 et seq., and the

Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. §§ 701 et seq. (Compl.[1] at 1).

Plaintiff asserts that he was suffering from hearing loss and Attention Deficit Hyperactivity

Disorder ("ADHD") while employed as an Assistant Signalman with the LIRR, and that because

the LIRR did not make reasonable accommodations for these disabilities, plaintiff was unable to

pass an oral examination required as part of an "up or out" promotion scheme. (Id. ¶¶ 9, 18, 23).

Plaintiff further asserts that had the LIRR made certain requested accommodations, he was

otherwise qualified to perform the duties of a higher position and would have been promoted.

Therefore, plaintiff claims that the LIRR discriminated against him on the basis of his hearing

loss and ADHD. (Id. ¶ 27). Plaintiff now seeks reinstatement with the LIRR, back pay, damages

for emotional pain and suffering, and attorney's fees. (Id. at 13).

---

[1]Citations to "Compl." refer to plaintiff's Complaint, filed March 29, 2006.

On September 5, 2007, the parties consented to the jurisdiction of this Court for trial. Subsequently, by Notice of Motion dated September 13, 2007, defendant moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking to dismiss plaintiff's claims on the grounds that "[p]laintiff fails to establish a *prima facie* case of discrimination on the basis of disability." (Def.'s Mem.[2] at 1). For the reasons set forth below, defendant's motion is granted in part and denied in part. Defendant's motion is granted with respect to the claims of discrimination on the basis of hearing impairment arising under the ADA, Rehabilitation Act, and NYSHRL. However, defendant's motion is denied with respect to the ADA, Rehabilitation Act, and NYSHRL claims for discrimination on the basis of ADHD, and the ADA retaliation claim. The Court reserves decision on defendant's argument to limit damages based on plaintiff's alleged application fraud to allow plaintiff to respond to that argument within 60 days of the date of this Memorandum and Order.

## FACTUAL BACKGROUND

On March 22, 2000, plaintiff was given a conditional offer of employment as a Signal Helper with the LIRR. (56.1 Stmnts ¶ 34; Geoghan Dep. at 38).[3] At the time plaintiff was hired,

---

[2]Citations to "Def.'s Mem." refer to the LIRR's Memorandum of Law in Support of Its Motion for Summary Judgment, filed September 13, 2007.

[3]Citations to "Geoghan Dep." refer to the Deposition of Andrew Geoghan annexed as Exhibit C to defendant's Motion for Summary Judgment, filed September 13, 2007. Citations to "Def.'s 56.1 Stmnt" refer to defendant's Rule 56.1 Statement of Material Uncontested Facts, filed September 13, 2007. Citations to "Pl.'s 56.1 Resp." and "Pl.'s 56.1 Add'l Stmnt" refer, respectively, to plaintiff's Response to Defendant's Statement of Undisputed Facts, and to plaintiff's statement entitled Additional Material Facts as to Which There Exists a Genuine Issue to be Tried, filed pursuant to Local Rule 56.1 on October 15, 2007. Citations to "56.1 Stmnts" refer to facts in defendant's Rule 56.1 statement which are admitted either explicitly or implicitly

the duties of a Signal Helper were, inter alia, to work with the Assistant Signalman "in the assembly, installation and testing of signal and communications equipment . . . [as well as maintaining] poles, [and providing] protection for gangs in accordance with LIRR rules." (Signal Helper Job Spec.[4] at 1). The Signal Helper position was designated by the LIRR as "safety-sensitive" because the job involved a number of hazards, including work "along the LIRR right-of-way where trains pass at high speed and [the] third rail is partially exposed" and working conditions "that are dry, wet, humid, dusty, dirty, noisy, hot, [and] cold." (Id.; 56.1 Stmnts ¶ 60; Geoghan Dep. at 52). As was the case for all employees in safety-sensitive positions, prior to beginning his employment with the LIRR, plaintiff was required to undergo a medical examination at the LIRR's medical facility in Mineola, New York. (56.1 Stmnts ¶¶ 35-37; Geoghan Dep. at 69-70).

The parties have differing accounts of what took place during this pre-employment examination. Plaintiff claims that he made the LIRR aware both of his hearing problem and his ADHD. (Compl. ¶ 9). On his initial medical questionnaire, plaintiff specifically noted his hearing problem. (Med. His. R.[5] at 2). Defendant concedes that plaintiff did make the LIRR's medical personnel aware of his hearing problem; in fact, the LIRR allowed plaintiff to take a required hearing test with hearing aids in place. (56.1 Stmnts ¶¶ 38-41). Plaintiff's hearing

_____

(i.e., where plaintiff fails to controvert the fact or raise a valid objection) in the corresponding paragraphs of plaintiff's 56.1 response.

[4]Citations to "Signal Helper Job Spec." refer to the document by the same title annexed as Exhibit V to defendant's Motion for Summary Judgment, filed September 13, 2007.

[5]Citations to "Med. His. R." refer to plaintiff's Medical History Record annexed as Exhibit Y to defendant's Motion for Summary Judgment, filed September 13, 2007.

problem did not bar him from employment as a Signal Helper because plaintiff was able to pass the required hearing test with his hearing aids. (56.1 Stmnts ¶ 41; Geoghan Dep. at 74).

Although plaintiff noted his hearing loss on the LIRR's medical history form, plaintiff did not indicate on this document that he was suffering from ADHD. (See Med. His. R.). Indeed, despite the allegations plaintiff made in his Complaint, plaintiff later admitted that he was not diagnosed with ADHD until July 2003 – after he had started working at the LIRR. (Geoghan Dep. at 77; Geoghan Aff.[6] ¶ 1).

Following his initial medical examination, Geoghan attended an orientation session for new LIRR employees. (56.1 Stmnts ¶ 46; Geoghan Dep. at 39). Upon completing this session, plaintiff acknowledged receipt of the LIRR's Control of Drug Use and Alcohol Misuse Policy, among other informational documents. (Ack. of Training[7]). Plaintiff agreed that he would be "accountable to understand and comply with the contents of the documents" given out at the orientation, including the Control of Drug Use and Alcohol Misuse Policy. (Id.) The Control of Drug Use and Alcohol Misuse Policy states:

> Safety-sensitive employees must consult with the LIRR Medical Facility Physician-in-Charge before using any substance, including over-the-counter medications which carry a warning label that indicates that mental functioning, motor skills, or judgment may be affected.

---

[6]Citations to "Geoghan Aff." refer to the Affidavit of Andrew Geoghan annexed as Exhibit A to plaintiff's Affidavit in Opposition to Motion for Summary Judgment, filed October 15, 2007.

[7]Citations to "Ack. of Training" refer to the Acknowledgment of Training Received annexed as Exhibit S to defendant's Motion for Summary Judgment, filed September 13, 2007.

(Drug Policy[8] at 2). Plaintiff admits that he was aware that the LIRR had a written alcohol and substance abuse policy during the time of his employment. (Geoghan Dep. at 90).

Upon completing the orientation, Geoghan began work as a Signal Helper on April 5, 2000. (56.1 Stmnts ¶ 57; Compl. ¶ 8). Plaintiff performed all aspects of his job as a Signal Helper satisfactorily; he did not make any accommodation requests for his disabilities, with the exception of occasionally asking others to speak up or repeat themselves. (56.1 Stmnts ¶ 73; Geoghan Dep. at 50-51).

On January 19, 2001, plaintiff was promoted to the position of Assistant Signalman. (56.1 Stmnts ¶ 78; Geoghan Dep. at 52). When he was promoted, the LIRR had an "up or out" promotion policy pursuant to the conditions of a collective bargaining agreement ("CBA") signed by the LIRR and the Brotherhood of Railroad Signalmen (the "Union"). (Def.'s 56.1 Stmnt ¶¶ 96-97). Any person promoted to the position of Assistant Signalman had four years to qualify for subsequent promotion to the position of Signalman or face termination. (Id. ¶¶ 96-99; Asst. Signalman Job Spec.[9] at 1). During this four-year period, the Assistant Signalman was to attend a training program in preparation for the LIRR's Practical Examination, which, when passed, would qualify the Assistant Signalman for promotion. (56.1 Stmnts ¶¶ 99-101; Compl. ¶ 12). Plaintiff acknowledges that he knew about the four-year time limit to qualify for promotion, but

---

[8]Citations to "Drug Policy" refer to the Control of Drug Use and Alcohol Misuse Policy annexed as Exhibit T to defendant's Motion for Summary Judgment, filed September 13, 2007. The Control of Drug Use and Alcohol Misuse Policy was amended and renamed the Alcohol and Substance Abuse Policy in September 2001. (Def.'s 56.1 Stmnt ¶ 53).

[9]Citations to "Asst. Signalman Job Spec." refer to the document by the same title annexed as Exhibit W to defendant's Motion for Summary Judgment, filed September 13, 2007.

he claims that a number of supervisors informed him that sick-leave would be excluded from the four-year calculation. (Geoghan Aff. ¶ 10).

Upon his promotion to Assistant Signalman, plaintiff began the two-part training program to prepare for the Practical Examination. (Id.) Plaintiff successfully completed Phase I of the training, which consisted of a computer-based course on "basic electronics theory." (Def.'s 56.1 Stmnt ¶¶ 105-06; Geoghan Dep. at 101; Meehan Dep.[10] at 12-13). Thereafter, plaintiff entered Phase II of the training, comprising approximately 100 sessions of both classroom instruction and fieldwork. (56.1 Stmnts ¶¶ 108-11; Meehan Dep. at 14-16). By passing six written examinations administered during the course of these sessions, plaintiff successfully completed his Phase II training on December 22, 2003. (56.1 Stmnts ¶¶ 122-32).

While in Phase II training, plaintiff claims that he told his instructor, Thomas Meehan, that he was suffering from ADHD. (Geoghan Dep. at 104-05). Meehan denies that plaintiff ever mentioned anything about ADHD – or any other learning disability – to him. (Meehan Dep. at 81).

Before taking the Practical Examination to qualify as a Signalman, plaintiff first had to receive a recommendation following a "Technical Knowledge Review." (Stawarz Dep.[11] at 25, 29). These Technical Knowledge Reviews were oral evaluations given throughout the course of Phase II training (id. at 22-23); an Assistant Signalman was recommended for the Practical Examination as soon as he/she demonstrated sufficient proficiency in the Phase II material. (Id.

---

[10]Citations to "Meehan Dep." refer to the Deposition of Thomas Meehan annexed as Exhibit D to defendant's Motion for Summary Judgment, filed September 13, 2007.

[11]Citations to "Stawarz Dep." refer to the Deposition of Gary Stawarz annexed as Exhibit E to defendant's Motion for Summary Judgment, filed September 13, 2007.

at 25, 58) The individuals administering the Technical Knowledge Reviews may also recommend that warning letters be sent for poor performance. (Id. at 58).

Plaintiff was given four Technical Knowledge Reviews on the following dates: October 21, 2002, February 9, 2003, July 25, 2003, and February 4, 2004. (56.1 Stmnts ¶¶ 142, 150, 154, 164). Geoghan's evaluators never recommended that he take the Practical Examination after any of these Technical Knowledge Reviews; instead, the plaintiff was sent two warning letters, dated August 6, 2003, and February 13, 2004.[12] (Def.'s 56.1 Stmnt ¶¶ 142-72; Def.'s Mot.[13] Exs. G-L). These warning letters explained to plaintiff that he was failing to demonstrate sufficient knowledge and improvement both during and after his Phase II training, and that plaintiff should contact Principal Engineer Raymond L. Freiberger for assistance. (Def.'s Mot. Exs. J, L). Plaintiff did not contact Freiberger for help with his Technical Knowledge Reviews. (Geoghan Dep. at 128-29).

Although none of plaintiff's Technical Knowledge Reviews resulted in a recommendation that he take a Practical Examination, plaintiff nevertheless took four Practical Examinations, all of which he failed. (56.1 Stmnts ¶ 197; Compl. ¶¶ 14, 17).[14] The LIRR's

---

[12]Upon being shown the two warning letters at his deposition, plaintiff testified that he did not recall whether he had received either of them (Geoghan Dep. at 122-23, 127), and pointed out that the letter dated February 13, 2004 begins "Dear Mr. Rivas." (Id. at 127-28; Def.'s Mot. Ex. L). However, plaintiff's correct name and address appear at the top of the February 13 letter (Def.'s Mot. Ex. L), and upon being asked whether he recalled receiving any warning letters from Freiberger, plaintiff responded, "I knew I got them but I don't know who they were from." (Geoghan Dep. at 128).

[13]Citations to "Def.'s Mot." refer to Defendant's Motion for Summary Judgment, filed on September 13, 2007.

[14]The Practical Examinations took place on February 19, 2004, August 12, 2004, October 5, 2004, and February 1, 2005. (56.1 Stmnts ¶¶ 198, 204, 215, 222; Compl. ¶¶ 14, 17).

Practical Examination consisted of two components: (1) answering questions orally before a panel of supervisors, and (2) troubleshooting in the field. (56.1 Stmnts ¶ 194). There was no limit on the number of Practical Examinations an Assistant Signalman could take, provided that he/she passed within the four-year time limit. (Stawarz Dep. at 87). One of the examiners who administered some of plaintiff's Practical Examinations, Gary Stawarz, stressed that the LIRR left little room for error on these Practical Examinations because the rules tested are "very safety sensitive" and:

> [w]hat happens after passing a practical is they give the individual the job he is qualified [for] [i.e., Signalman]. Anytime, it could be that night at midnight he could be out in the field with an assistant by himself applying these rules.

(Stawarz Dep. at 97). After failing his first two Practical Examinations, the LIRR sent plaintiff a warning letter stating that plaintiff "[was failing] to demonstrate . . . sufficient knowledge to warrant a promotion into the mechanic's[15] class." (Def.'s Mot. Ex. O). Again, Principal Engineer Raymond Freiberger offered his assistance, but plaintiff made no contact with Freiberger. (Id.; Geoghan Dep. at 139).[16]

After failing his fourth Practical Examination on February 1, 2005, plaintiff went to the LIRR's medical facility on February 9, 2005 to file a request for reasonable accommodations under the ADA. (56.1 Stmnts ¶¶ 236-40). During this visit, plaintiff presented a letter dated October 21, 2004 from his physician, Dr. Salvatore Giantinoto. (Id.; see Geoghan Dep. at 153-

---

[15]The term "mechanic" is synonymous with the term "Signalman." (Id. ¶ 98).

[16]Union representatives were also present at each one of plaintiff's Practical Examinations. (Geoghan Dep. at 132). Plaintiff does not recall voicing any objections or complaints to any Union representative during or after any of the tests. (Geoghan Dep. at 132-33, 136-37, 139-40, 151).

54). In this letter, Dr. Giantinoto stated that: (1) plaintiff suffers from ADHD; (2) plaintiff has been taking 10 mg of Adderall daily for his ADHD "for the past year;" and (3) plaintiff "requires much more effort to learn or recite new information." (Giantinoto Letter[17]). On the basis of Dr. Giantinoto's ADHD diagnosis, plaintiff requested between three and six months more time to study and re-take the Practical Examination. (Def.'s Mot. Ex. AA). He also asked to have the Practical Examination conducted in a written, as opposed to oral, format. (Id.) This was the first time plaintiff made a request for a reasonable accommodation during his employment with the LIRR. (Geoghan Dep. at 57).

Shortly after the accommodation request was made, the LIRR terminated plaintiff in a letter dated February 15, 2005. (56.1 Stmnts ¶ 231). Defendant claims that the reason for Geoghan's termination was simply that plaintiff had failed to qualify for promotion within the four-year time limit prescribed by the CBA. (Def.'s 56.1 Stmnt ¶¶ 229-30).[18]

---

[17]Citations to "Giantinoto Letter" refer to the letter of Dr. Salvatore Giantinoto annexed as Exhibit K to plaintiff's Affidavit in Opposition to Motion for Summary Judgment, filed October 15, 2007.

[18]Additionally, upon receiving Dr. Giantinoto's letter disclosing that plaintiff had been taking Adderall, the LIRR filed disciplinary charges against plaintiff for violating its policies on drugs and alcohol. (Id. ¶ 248). As noted above, safety-sensitive employees had to receive LIRR approval prior to taking medications that might have impaired judgment. (Drug Policy at 2). Not only did plaintiff never receive authorization for Adderall, a drug that defendant claims can impair judgment, but defendant also asserts that prior to the February 9, 2005 visit, the LIRR had already advised plaintiff that he was not permitted to take the medication. (Def.'s 56.1 Stmnt ¶¶ 182, 189). Both parties agree that during a return-to-work evaluation at the LIRR medical facility in April 2004, plaintiff informed Physician's Assistant Theresa Colasanti that he was taking Adderall. (Id. ¶ 188; Geoghan Aff. ¶ 25). Although Colasanti testified that she told plaintiff that he could not take Adderall while employed as an Assistant Signalman, plaintiff claims Colasanti said no such thing. (Def.'s 56.1 Stmnt ¶ 189; Geoghan Aff. ¶ 25). Plaintiff also claims that after his February 2005 consultation, he had several communications with the LIRR's head physician, Dr. Tremaroli, to discuss ending the Adderall and returning to work. (Geoghan Aff. ¶¶ 27-29). Regardless, disciplinary proceedings on plaintiff's alleged violation of the

In response, plaintiff claims he was under the impression that he had more time to pass his Practical Examination because he did not believe that sick-leave counted toward the four-year time limit. (Pl.'s 56.1 Add'l Stmnt ¶¶ 17-18). Taking sick-leave into account, plaintiff estimates that he had at least two more months after he failed his fourth Practical Examination to qualify for promotion. (Id. ¶ 18). Had plaintiff received the requested accommodations, plaintiff claims that he would have passed the Practical Examination and been otherwise qualified to perform the duties of a Signalman. (Compl. ¶¶ 33-34).

Plaintiff filed suit under the ADA, the NYSHRL, and the Rehabilitation Act contending that the LIRR terminated him on the basis of his ADHD and hearing loss. Defendant claims that the termination was due to plaintiff's inability to comply with the LIRR's non-discriminatory four-year time limit to qualify for a promotion.

## DISCUSSION

### A. Standards for Summary Judgment

It is well-settled that a party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990). Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, see Egelston v. State Univ. Coll. at Geneseo, 535 F.2d 752, 754 (2d

---

LIRR's drug and alcohol policy were held in abeyance because of his termination on separate grounds. (Def.'s 56.1 Stmnt ¶¶ 248-50).

Cir. 1976); Gibralter v. City of New York, 612 F. Supp. 125, 133-34 (E.D.N.Y. 1985) (stating that summary judgment "is a drastic remedy and should be applied sparingly"), the Court should not grant summary judgment unless "it is quite clear what the truth is and that no genuine issue remains for trial." Auletta v. Tully, 576 F. Supp. 191, 195 (N.D.N.Y. 1983) (internal quotation marks and brackets omitted), aff'd, 732 F.2d 142 (2d Cir. 1984). In addition, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

Once the moving party discharges its burden of proof under Rule 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 858 (S.D.N.Y. 1991) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. Indeed, "the mere existence of *some* alleged factual dispute between the parties" will not by itself defeat a properly supported motion for summary judgment. Id. at 247-48. Rather, enough evidence must favor the non-moving party's case such that a reasonable jury could return a verdict in its favor. Id. at 248.

In reversing a grant of summary judgment, the Second Circuit noted that the "'[t]rial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.'" Quaratino v. Tiffany & Co., 71 F.3d 58, 65 (2d Cir. 1995) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

B. Plaintiff's Rule 56.1 Response

Plaintiff, as the party opposing the motion for summary judgment, was required to submit a response to defendant's statement of material uncontested facts. Local Civil Rule 56.1(b). Local Civil Rule 56.1 mandates that for purposes of this motion, the Court treat as admitted defendant's Rule 56.1 statement of uncontested facts, unless "*specifically* controverted by a *correspondingly numbered paragraph in* the statement required to be served by the opposing party." Local Civil Rule 56.1(c).

Plaintiff's counsel has failed to follow this rule. Although occasionally admitting or denying the facts set forth in defendant's Rule 56.1 Statement, much of plaintiff's submission consists of paragraphs similar to the following example:

> 10. Object to the citation to the Affidavit of Kathleen M. Meilick in that this is not admissible evidence to support the alleged fact in accordance with Rule 56 and Local Rule 56.1(d) because this cited reference is inadmissible hearsay.

(Pl.'s 56.1 Resp. ¶ 10). The corresponding paragraph in defendant's Rule 56.1 statement states:

> 10. Plaintiff attended Suffolk County Community College from 1983 to 1985. Geoghan Dep. p.25; Affidavit of Kathleen M. Meilick ("Meilick Aff.") Ex. "R."

(Def.'s 56.1 Stmnt ¶ 10). Looking again at plaintiff's objection in this example, not only does plaintiff fail to admit or deny the truth of the statement asserted – namely, that he "attended Suffolk County Community College from 1983 to 1985"– but it is also unclear whether he is objecting to Meilick's Affidavit or to the exhibit included within the submission. Nonetheless, construed either way, plaintiff's objection is not properly grounded. Affidavits are commonly used for purposes of deciding a motion for summary judgment. Federal Rule of Civil Procedure

56(e) sets forth the guidelines for the form of affidavits to be submitted on a motion for summary judgment, stating that "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e). The affidavits submitted by defendant appear to be consistent with the conditions set forth in Rule 56(e), and the attached exhibits are generally admissible, as they were in the custody of the affiants submitting them and are mostly business records. The plaintiff has not directed the Court's attention to any example of inadmissible hearsay within the various affidavits and exhibits submitted by defendant. Certainly plaintiff's blanket objection in paragraph 10 to defendant's citation of the Meilick Affidavit and plaintiff's resume (which was attached as Exhibit R) is unwarranted. The Meilick Affidavit is based on Ms. Meilick's personal knowledge and establishes that the plaintiff's resume is an admission by a party-opponent not excluded by the hearsay rule. Fed. R. Evid. 801(d)(2). Furthermore, the statement in paragraph 10 is adequately supported by the Geoghan Deposition, which contains the plaintiff's testimony about his own education – clearly admissible evidence.

More significantly, plaintiff's objections fail to controvert the facts asserted by defendant. To dispute the assertion in the example quoted above, plaintiff was required to specifically controvert it with citation to admissible evidence. Local Civil Rule 56.1(c)-(d). Since plaintiff's response does not dispute the accuracy of the assertion, the assertion is deemed to be admitted by plaintiff for purposes of this motion.

Plaintiff also objects to defendant's references to "unproven allegations contained in a Complaint." (See, e.g., Pl.'s 56.1 Resp. ¶ 6). Plaintiff makes this objection each time defendant

cites plaintiff's own Complaint as evidence for a fact contained in defendant's Rule 56.1 Statement. (Pl.'s 56.1 Resp. ¶¶ 6, 57, 73, 91, 101, 174, 176, 195-98, 201, 207, 222, 226). The Second Circuit has held that "[a] verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995); see also Arar v. Ashcroft, 532 F.3d 157, 171 (2d Cir. 2008) (reh'g en banc granted Aug. 12, 2008). The plaintiff labeled his Complaint with the title "Verified Complaint" (Compl. at 1), but failed to include a signature page indicating that he swore under penalty of perjury that all allegations were true. His objections imply that he wishes the Court to treat the Complaint as unverified. However, plaintiff testified in his deposition that all of the allegations contained in the Complaint are true, thus verifying their accuracy. (Geoghan Dep. at 13). The Court therefore finds plaintiff's objections to the citations to the Complaint in defendant's Rule 56.1 Statement to be without merit.

C. ADA Discrimination

    1) Standards

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to . . . the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a); see Sutton v. United Air Lines, 527 U.S. 471, 476 (1999). In ADA discrimination cases, the plaintiff has an initial burden of alleging a *prima facie* case. Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869 (2d Cir. 1998). There are four elements that a plaintiff must show to make out a *prima facie* case of discrimination under the ADA: (1) the

14

employer is subject to the ADA; (2) the plaintiff suffers from a disability as defined by the ADA; (3) the plaintiff is otherwise qualified to perform the tasks required of the job; and (4) the plaintiff suffered an adverse employment action as a result of his disability. See id. at 869-70; see also Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001); Cusack v. News America Marketing In-Store Servs., L.L.C., No. 06 CV 6166, 2008 WL 2663001, at *4 (S.D.N.Y. Jul. 2, 2008). Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the termination. See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, 198 F.3d 68, 72 (2d Cir. 1999). If the defendant meets its burden, it then falls to the plaintiff once again to demonstrate that the defendant's proffered explanation is a pretext for termination based on disability. See id.

The ADA also prohibits an employer from failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A); see Lovejoy-Wilson v. NOCO Motor Fuel, 263 F.3d 208, 216 (2d Cir. 2001). Thus, a plaintiff can also make out a *prima facie* case of discrimination under the ADA by showing that (1) he is an individual with a disability as defined by the ADA; (2) an ADA-covered employer had notice of his disability; (3) with reasonable accommodation, he could perform the essential functions of the job sought; and (4) the employer refused to make such reasonable accommodation. Id.

Here, defendant claims that plaintiff cannot establish a *prima facie* case of discrimination. (Def.'s Mem. at 1). Therefore, the Court begins by examining whether plaintiff meets the four-

part test set forth in Ryan and Lovejoy-Wilson. Since there is no dispute that the LIRR is an entity covered by the ADA (id. at 2-3), the Court addresses the question of whether plaintiff suffers from a disability under the meaning of the ADA.

### 2) Inapplicability of ADA Amendments Act of 2008

As an initial matter, the Court recognizes that in September 2008, Congress enacted the ADA Amendments Act of 2008, Pub. L. No. 110-325 ("ADA Amendments"). Among other changes, the ADA Amendments significantly expand the scope of the ADA's definition of disability. The bill's "Findings" and "Purposes" sections explain that the changes are intended to reject some of the limitations imposed by the Supreme Court's holdings in Sutton v. United Air Lines, 527 U.S. 471 (1999), and Toyota Motor Manufacturing v. Williams, 534 U.S. 184 (2002), which Congress felt had "narrowed the broad scope of protection intended to be afforded by the ADA." ADA Amendments § 2. Since this case was briefed and argued well before the enactment of the ADA Amendments, the parties have not discussed their applicability here. However, because the changes took effect January 1, 2009, id. § 8, the Court must determine whether to apply the law as amended or the law as it existed before the amendments. While the statute explicitly states the date it was to take effect, it makes no mention of whether it is to be applied retroactively.

In a pair of cases relating to the Civil Rights Act of 1991, the Supreme Court discussed whether statutory amendments should be applied to cases arising from events predating enactment of the amendments. In Landgraf v. USI Film Products, the Court stated that where, as here, a statute is not explicit as to its retroactivity, a court "must determine whether the new statute would have retroactive effect" as to the case before it. 511 U.S. 244, 280 (1994). In other

words, it must ascertain whether the statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Id. If so, the court must apply the "traditional presumption" that the statute "does not govern absent clear congressional intent favoring such a result." Id.

In Landgraf's companion case, Rivers v. Roadway Express, the Court examined a situation directly analogous to that presented by the ADA Amendments – namely, whether to retroactively apply a part of the Civil Rights Act of 1991 which Congress had enacted in response to a Supreme Court decision that had narrowed the applicability of the preexisting civil rights statute. 511 U.S. 298 (1994). The Court held that "[e]ven when Congress intends to supersede a rule of law embodied in one of our decisions with what it views as a better rule established in earlier decisions, its intent to reach conduct preceding the 'corrective' amendment must clearly appear" before the statute can be retroactively applied. Id. at 313.

As discussed below, there is a serious question as to whether plaintiff has shown that he is disabled within the meaning of the ADA as it stood prior to the ADA Amendments. To the extent the Court would reach a different conclusion under the amended statute, the amendments would clearly have the effect of "increas[ing] a party's liability for past conduct" by imposing on defendant the restrictions the ADA places on an employer as to its treatment of a disabled employee. Application of the ADA Amendments would therefore have a "retroactive effect," and the Court must give effect to the presumption against application of the statute, and apply the law as it existed before the amendments.[19]

---

[19]In this case, although the issue is a close one, the Court has concluded that under the pre-amendment law, plaintiff has presented the absolute minimum amount of evidence necessary to survive dismissal at this stage. Thus, even if the Amendments were applied retroactively in this

Other courts that have addressed the retroactivity of the ADA Amendments in the short time since they took effect have concluded that they do not apply retroactively. See, e.g., EEOC v. Agro Distrib., No. 07-60447, 2009 WL 95259, at *5 n.8 (5th Cir. Jan. 15, 2009); Kravar v. Triangle Servs., No. 06 CV 7858, 2009 WL 805807, at *4 n.3 (S.D.N.Y. Mar. 27, 2009); Moran v. Premier Educ. Group, No. 3:06 CV 1330, 2009 WL 507505, at *7 (D. Conn. Feb. 13, 2009); Schmitz v. Louisiana, No. 07-891-SCR, 2009 WL 210497 (M.D. La. Jan. 27, 2009); Rudolph v. U.S. Enrichment Corp., No. 08 CV 46, 2009 WL 111737, at *4-6 (W.D. Ky. Jan. 15, 2009). This Court agrees that the ADA Amendments do not apply retroactively and thus are inapplicable to the claims in this case. The Court will apply the statute as it existed before the amendments.

3) Disability under the ADA

An individual diagnosed with an ailment does not automatically obtain the protections of the ADA. Rather, the ADA states:

> The term "disability" means, with respect to an individual –
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (2006) (amended by ADA Amendments Act of 2008, Pub. L. No. 110-325, § 4). In the case at hand, it does not suffice for plaintiff to merely show that he suffers from some form of disability; the disability must "substantially limit" a "major life activity" of the plaintiff.

---

case, it would not alter the Court's determination on the motion for summary judgment except to make it clear that plaintiff had carried his burden.

In order to establish whether plaintiff suffers from a disability as defined by the ADA, the Court uses the following three-step test: (1) does plaintiff suffer from some form of mental or physical impairment; (2) are there any "major life activities" affected by the impairment; and (3) does the impairment substantially limit the major life activities identified? See Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 641 (2d Cir. 1998) (citing Bragdon v. Abbot, 524 U.S. 624, 631 (1998)), cert. denied, 526 U.S. 1018 (1999).

### a) Plaintiff's Impairments

Plaintiff submits sufficient evidence to demonstrate that he suffers from two impairments eligible for protection under the ADA: hearing loss and ADHD. Hearing loss has been widely accepted as a legitimate impairment with the potential to substantially limit life activities, see Miller v. Taco Bell Corp., 204 F. Supp. 2d 456, 463 (E.D.N.Y. 2002), and defendant concedes that plaintiff's hearing loss is an impairment for the purposes of this motion. (Def.'s Mem. at 5). Defendant takes a similar position regarding ADHD, admitting that the disease does constitute a mental impairment under the ADA. (Id. at 9); see Blank v. Investec Ernst & Co., No. 02 CV 3260, 2004 WL 2725138, at *4 (S.D.N.Y. Nov. 29, 2004).

However, defendant contends that plaintiff has produced no admissible evidence to demonstrate that he was ever diagnosed with ADHD. (Def.'s Mem. at 9). The Court disagrees. On July 25, 2003, plaintiff's physician, Dr. Steven Levine, made a note in plaintiff's medical file that plaintiff was suffering from ADHD and that he would be prescribed Adderall as treatment. (Pl.'s Aff.[20] Ex. C). The medical records and affidavit of plaintiff's subsequent physician, Dr.

---

[20]Citations to "Pl.'s Aff." refer to plaintiff's Affidavit in Opposition to Motion for Summary Judgment, filed October 15, 2007.

Salvatore Giantinoto, also show that plaintiff was suffering from ADHD. (Giantinoto Aff.[21] ¶ 3; Pl.'s Aff. Ex. E). Even Theresa Colasanti, the LIRR physician's assistant who examined plaintiff in April 2004, testified that she could think of no reason why someone would be taking Adderall other than for ADHD. (Colasanti Dep.[22] at 58-59). Plaintiff presents sufficient evidence of an ADHD diagnosis for the Court to continue with its analysis of whether plaintiff's ADHD substantially limited one or more major life activities.

b) <u>Major Life Activities</u>

Having established that plaintiff presented sufficient evidence that he suffers from two impairments as defined by the ADA – hearing loss and ADHD – the next step is for the Court to examine whether plaintiff has identified any major life activities affected by his disabilities. Plaintiff's hearing loss impacts the major life activity of hearing. A number of courts and the Equal Employment Opportunity Commission ("EEOC") have classified hearing as a major life activity under the ADA.[23] <u>See</u> <u>Miller v. Taco Bell Corp.</u>, 204 F. Supp. 2d at 463 (describing hearing as "clearly an ADA 'major life activity'"); 29 C.F.R. § 1630.2(i).[24]

---

[21]Citations to "Giantinoto Aff." refer to the Affidavit of Dr. Salvatore Giantinoto annexed as Exhibit F to plaintiff's Affidavit in Opposition to Motion for Summary Judgment, filed October 15, 2007.

[22]Citations to "Colasanti Dep." refer to the deposition of Theresa Colasanti annexed as Exhibit F to defendant's Motion for Summary Judgment, filed September 13, 2007.

[23]In the ADA Amendments, Congress explicitly included hearing as a major life activity. ADA Amendments sec. 4, § 3(2)(A).

[24]Prior to the ADA Amendments, which explicitly grant authority to the EEOC "to issue regulations implementing the definitions of disability," ADA Amendments § 6(a)(2), the Supreme Court had not established the precise weight to be accorded EEOC regulations, which have been commonly used in analyzing ADA claims. <u>See</u> <u>Toyota Motor Mfg. v. Williams</u>, 534 U.S. 184, 194 (2002). However, in <u>Toyota Motor Manufacturing</u>, since both parties deferred to EEOC regulations to prove their claims, as the parties do here, the court assumed the regulations

As for ADHD, plaintiff claims that "[h]is inability to process information and to verbalize this information is an impairment of a major life activity of both hearing and learning and substantially limits a major life activity of working." (Pl.'s Mem.[25] at 6). Additionally, plaintiff claims that he is also substantially limited in his "ability to learn, concentrate and verbalize information." (Id. at 8). Evidently then, plaintiff claims that the four major life activities affected by his ADHD are working, learning, concentrating, and verbalizing information.

In defining the phrase "major life activity," EEOC regulations state that such activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The Second Circuit has cited this EEOC definition as a guide for determining the scope of major life activities under the ADA. See Colwell v. Suffolk County Police Dep't, 158 F.3d at 642. Accordingly, in light of the EEOC definition relied on by both parties, this Court concludes that learning and working are major life activities which may potentially be impaired by ADHD.

Regarding concentration, defendant invites the Court to find outright that concentration is not a major life activity, relying upon decisions of the Sixth and Tenth Circuits. (Def.'s Mem. at 10 n.5 (citing Linser v. Ohio Dep't of Mental Health, No. 99-3887, 2000 U.S. App. LEXIS 25644, at *9 (6th Cir. Oct. 6, 2000); Pack v. Kmart Corp., 166 F.3d 1300, 1305 (10th Cir.), cert. denied, 528 U.S. 811 (1999))). In the Second Circuit, however, district courts have tended to classify concentration as a major life activity for purposes of ADA claims. See Sussle v. Sirina

---

were reasonable. Id. Furthermore, the Second Circuit gives "'great deference' to the EEOC's interpretation of the ADA." Francis v. City of Meriden, 129 F.3d 281, 283 n.1 (2d Cir. 1997).

[25]Citations to "Pl.'s Mem." refer to plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, filed October 15, 2007.

Prot. Sys. Corp., 269 F. Supp. 2d 285, 299 (S.D.N.Y. 2003) (citing cases).  But see Pack v. Kmart Corp., 166 F.3d at 1305 (finding that "[c]oncentration may be a significant and necessary component of a major life activity, such as working, learning, or speaking, but it is not an 'activity' itself").  This Court agrees with those courts that have concluded that concentrating is a major life activity.  Indeed, under the ADA Amendments, concentrating is now explicitly classified as a major life activity.  ADA Amendments sec. 4, § 3(2)(A).

Finally, the plaintiff has not presented—and the Court has not identified—any precedent for treating the ability to "verbalize information" as a major life activity.  Though it may be related to other activities such as speaking or interacting with others which are generally considered major life activities, the phrase nevertheless has a distinct meaning and the plaintiff appears to use it purposefully.  The Court will therefore proceed on the assumption that verbalizing information is not itself a major life activity.

c) Substantial Limitations

Turning to the final step, the Court must determine whether plaintiff has a disability under the ADA.  In essence, the Court inquires as to whether plaintiff's impairments *substantially limit* the major life activities – hearing, learning, and working – identified previously.  EEOC regulations have defined the phrase "substantially limits" to mean the following:

> i) Unable to perform a major life activity that the average person in the general population can perform; or
> ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

22

29 C.F.R. § 1630.2(j)(1). The EEOC has also included the following factors to be considered in determining whether an individual is substantially limited in a major life activity:

> i) The nature and severity of the impairment;
> ii) The duration or the expected duration of the impairment; and
> iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2). See Toyota Motor Mfg. v. Williams, 534 U.S. at 195-96.

Interpreting the ADA in Toyota Motor Manufacturing, the Supreme Court noted that "Congress intended the existence of a disability to be determined in . . . a case-by-case manner." 534 U.S. at 198. Therefore, "the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'" Id. (quoting Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 567 (1999)) (modification in original).

The Supreme Court has also established the following rule regarding corrective devices:

> If a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures – both positive and negative – must be taken into account when judging whether that person is "substantially limited" in a major life activity and thus "disabled" under the [ADA].[26]

Sutton v. United Air Lines, 527 U.S. at 482. For example, when a plaintiff uses a hearing aid but fails to present evidence that his or her ability to hear is substantially limited with use of the aid, there remains no triable issue of fact as to whether the plaintiff's hearing is substantially limited. See Miller v. Taco Bell Corp., 204 F. Supp. 2d at 463 (noting that "the court must consider

---

[26]Although Congress has changed this rule to provide that the determination of whether a person is disabled should be made without regard to any corrective measures other than eyeglasses or contact lenses, see ADA Amendments, sec. 4, § 3(4)(E), this Court must apply the law as it existed prior to the ADA Amendments. See supra at 16-18.

Plaintiff's condition as she functions on a daily basis, that is, with the use of her hearing aid").

i) <u>Hearing Loss</u>

Applying these pre-Amendment standards to this case, it is plain that no reasonable jury could find that plaintiff's hearing substantially limits any of his major life activities. Plaintiff has not produced any evidence demonstrating that his hearing is still substantially limited with hearing aids. It is undisputed that plaintiff wears hearing aids and that he wore them for the duration of his employment with the LIRR. (56.1 Stmnts ¶¶ 3-4; Geoghan Dep. at 59-61). By plaintiff's own admission, with hearing aids on, he can hear at "approximately 90 to 90 percent [sic]." (Geoghan Dep. at 60). Furthermore, with hearing aids, plaintiff passed the LIRR's required hearing test (Maieli Aff.[27] ¶ 16; Geoghan Dep. at 74), and despite the need to communicate in order to perform the jobs of Signal Helper and Assistant Signalman (Signal Helper Job Spec. at 2; Asst. Signalman Job Spec. at 2; Geoghan Dep. at 48-49, 54-55), he "never had any job performance issues" while employed in those positions. (56.1 Stmnts ¶¶ 74, 92).

In his deposition testimony, plaintiff suggests there might be a triable issue of fact as to the extent of any limitation on his hearing:

> I had no problem talking but receiving some instructions I would have to tell certain people if they thought that I was not hearing them properly I would have to repeat myself just to let them know that I wore hearing aids . . . I made [whomever I was working with] aware that I did have a hearing problem [and] that if they thought I wasn't doing what they were asking, just come over and talk to me
> . . . .

(Geoghan Dep. at 49, 51). However, in the same portion of plaintiff's deposition, he admits that

---

[27]Citations to "Maieli Aff." refer to the Affidavit of Salvatore F. Maieli annexed to defendant's Motion for Summary Judgment, filed September 13, 2007.

he was able to "perform all of the job duties listed in the signal helper job description" (id. at 50), which includes "receiving instructions" and "monitoring [the] radio for instructions and information." (Signal Helper Job Spec. at 2). In fact, not only did plaintiff work adequately as a Signal Helper, but the quality of his work merited plaintiff a promotion to the position of Assistant Signalman. (See Geoghan Dep. at 52). Clearly, the mild inconvenience of asking co-workers to repeat themselves did not present a substantial limitation on plaintiff's ability to hear while working at the LIRR.

As for plaintiff's performance during his Practical Examinations, plaintiff presents no evidence to demonstrate that hearing loss played any role whatsoever in causing the multiple examination failures. Prior to attempting the Practical Examination, plaintiff successfully completed a training course that involved approximately 100 sessions of both in-class and field instruction; it is difficult to comprehend how plaintiff could have passed this course had he been substantially limited in his ability to hear. (See 56.1 Stmnts ¶¶ 108-18, 122-32). Moreover, plaintiff admitted that he did not "find it impossible to hear questions" asked of him during the Practical Examinations. (Geoghan Dep. at 134, 137, 140, 151). Furthermore, plaintiff's memorandum opposing summary judgment does not reference his hearing loss as a basis for a discrimination claim under the ADA. (Pl.'s Mem.).

Based on the evidence presented, the Court finds that no reasonable jury would conclude that plaintiff's hearing loss substantially limited his ability to perform any major life activity. Accordingly, the Court finds that plaintiff does not have a hearing disability under the terms of the ADA.

ii) <u>ADHD</u>

As to ADHD, however, plaintiff's doctor's ADHD diagnosis in conjunction with plaintiff's own detailed description of his difficulties taking the Practical Examinations constitute a sufficient basis on which a reasonable jury could conclude that he is disabled.

In presumably comparing individuals with ADHD to the general population, Dr. Giantinoto notes that: "Patients diagnosed with ADHD frequently exhibit difficulty in giving close attention to details . . . often do not seem to listen when spoken to directly, often fail to follow instructions carefully and *require more effort to learn or recite new information.*" (Giantinoto Aff. ¶ 4 (emphasis added)). With respect to Mr. Geoghan's specific diagnosis, Dr. Giantinoto finds that "[w]hile [plaintiff] has achieved a normal level of professional functioning, it is clear that ADHD has afflicted him in a number of very real and observable ways including the inability to recite new information in an oral test setting." (Giantinoto Aff. ¶ 9). He also notes that ADHD is "hallmarked by symptoms including distractibility and lack of poor [sic] sustained attention." (<u>Id.</u> ¶ 3).

Plaintiff, in discussing the difficulties he encountered when taking the LIRR's Practical Examinations, states as follows:

> Although I knew the information [being tested on the Practical Examinations], I found that I was having a great deal of difficulty responding correctly to the oral questions. I realized that my disability was making it difficult for me to convey the information to the examiners. For example, when asked a question, I would know the answer to be ABC; however, when I answered the question, it would come out as CBA, even though I thought I had said ABC. When I was asked the question again, I would just become more confused. I attributed this problem to the fact that even though I understood and knew the information, I had difficulty verbally conveying the information to the examiner. I

> did find that when I had more time and was able to write out
> answers, I was able to convey the information, which I did, in fact,
> know.

(Geoghan Aff. ¶ 13). On the basis of this evidence, as well as his past success on written exams administered as part of the LIRR training program and his difficulty with oral Technical Knowledge Reviews, plaintiff argues that "he would have been able to pass an examination had it been in written form." (Pl.'s Mem. at 7).

As to the major life activity of working, plaintiff must demonstrate that he is "significantly restricted in the ability to perform either *a class of jobs or a broad range of jobs in various classes* as compared to the average person having comparable training, skills, and abilities." Sutton v. United Air Lines, 527 U.S. at 491 (emphasis added). Plaintiff, however, has not submitted evidence showing that his ability to work is substantially limited with respect to any job, much less a class of jobs or a broad range of jobs. The record demonstrates that he satisfactorily performed the jobs of Signal Helper and Assistant Signalman without any accommodations for his ADHD, and plaintiff argues that he would not be substantially limited in his ability to perform the job of Signalman, if only the LIRR would provide an alternative way for him to demonstrate the knowledge necessary for the job and grant him his desired promotion. Moreover, plaintiff's own physician describes his "level of professional functioning" as "normal." (Giantinoto Aff. ¶ 9). Plaintiff, therefore, has not raised a triable issue of fact as to a substantial limitation in his ability to work.

With respect to learning and concentrating, defendant argues that "plaintiff has failed to produce any evidence comparing his ability to think, learn, or concentrate with the average person . . . [and thus] this lack of comparative evidence dooms his claim." (Def.'s Mem. at 10).

27

See DeMar v. Car-Freshner Corp., 49 F. Supp. 2d 84, 91 (N.D.N.Y. 1999) (noting that plaintiffs must present evidence "demonstrating that [they are] substantially limited in [their] ability to concentrate in comparison to the general population"); 29 C.F.R. § 1630.2(j)(1); see also Kohn v. AT&T Corp., 58 F. Supp. 2d 393, 416 (D.N.J. 1999). However, Dr. Giantinoto's finding that plaintiff is "afflicted" in "a number of very real and observable ways" is an implicit comparison to the average person in the general population, as is the diagnosis of ADHD itself, a condition which by its very nature entails difficulty concentrating in comparison to the general population. Moreover, plaintiff's affidavit relates confusion experienced during the examinations that, if accurate, describes a limitation in his ability to learn and concentrate that a jury could conclude is substantial as compared to the average person.

A plaintiff must also "offer[] evidence that the extent of the limitation *in terms of [his] own experience* . . . is substantial." Albertson's, Inc. v. Kirkingburg, 527 U.S. at 567 (emphasis added). The statements of both Dr. Giantinoto and the plaintiff satisfy this requirement by describing plaintiff's limitations in terms of his own experience. Both statements make clear that these limitations are substantial—Dr. Giantinoto describes an "inability to recite new information" and Geoghan describes the "great deal of difficulty" he had responding to questions.

Defendant points to plaintiff's own deposition testimony as evidence that "he had the ability to 'learn' on the job." (Def.'s Mem. at 11). This apparently refers to part of a response plaintiff gave to a question about how much he studied as part of the training he underwent while he was an Assistant Signalman. Plaintiff stated:

28

> . . . [W]orking was part of your study. You were learning as you
> were doing. Questions and answers with the mechanic, questions
> and answers with other individuals who were in the course and you
> would stay late and study longer because you go to the places. . . .

(Geoghan Dep. at 108). "Plaintiff's admitted ability to learn on the job," defendant argues,

"defeats any conclusory allegations to the contrary set forth in his Complaint." (Def.'s Mem. at

11). Plaintiff's admission, however, that he had *some* ability to learn on the job does not

undermine his argument that his ability to learn was substantially limited. Certainly this off-hand

acknowledgment that he was learning something from his training fails to demonstrate that he is

not disabled.

Defendant also cites plaintiff's past academic and employment record as evidence

weighing against a conclusion that he is substantially limited in his ability to learn or concentrate.

Specifically, plaintiff's resume indicates that he successfully completed multiple vocational

courses in electronics and community college courses in business management. (Def.'s Mot. Ex.

R). Prior to joining the LIRR, plaintiff held jobs involving electronics at NYNEX, Medco, and

Robotic Visions Systems (Def.'s Mot. Ex. R), and plaintiff does not recall asking for any

accommodation related to ADHD at any of these previous jobs. (Geoghan Dep. at 31-33).

In addition to this successful history of employment at prior jobs, defendant notes that at

the LIRR, plaintiff satisfactorily performed his job as a Signal Helper and Assistant Signalman

without accommodation for his ADHD. (56.1 Stmnts ¶¶ 108-11, 122-32). Plaintiff also passed a

two-part training program consisting of classroom instruction, fieldwork, and six written

examinations. (Id.) One of plaintiff's instructors, Thomas Meehan, testified at his deposition

that during this course, plaintiff never gave Meehan the impression that he had difficulty

understanding the classroom sessions, nor did plaintiff tell Meehan that he was struggling with the material. (Meehan Dep. at 28). When asked whether plaintiff exhibited any confusion relating to information during the course, Meehan further testified that any difficulties plaintiff had were "not out of the ordinary." (Id. at 29). Meehan, however, also mentioned that plaintiff would sometimes say, "Go on to someone else," when asked questions about material assigned as homework (id. at 27-28), and plaintiff argues that this classroom behavior is evidence that his ability to learn is substantially limited, in that his problems answering oral questions "stemmed . . . from [plaintiff's] inability to process stored memory into a cognizable, coherent answer." (Pl.'s Mem. at 9).

To be sure, plaintiff's previous coursework and Meehan's testimony call into question the credibility of plaintiff's assertions regarding how substantial his difficulties in learning and concentrating are. However, such credibility determinations are to be made by a jury, not by the Court on a motion for summary judgment. Plaintiff has articulated specific and—he alleges—serious learning and concentration difficulties which his physician describes as resulting from clinically diagnosed ADHD. A jury could reasonably conclude that these allegations amount to a disability under the ADA.

Defendant next cites a litany of cases in which plaintiffs with ADHD were found not to be disabled under the ADA. (Def.'s Mem. at 12-13). These cases, however, are distinguishable from this one. For example, in DeMar v. Car-Freshner Corp., the only evidence plaintiff cited was an ADHD diagnosis, and the court found that the plaintiff "leaps to the conclusion that because he has ADHD, his ability to concentrate is substantially limited as compared to the average person." 49 F. Supp. 2d at 91. Beyond the diagnosis, the plaintiff "offered only

conclusory allegations regarding the impact of his condition [on his ability to concentrate] as compared to the average person," leading the court to emphasize that "neither 'conclusory statements, conjecture, [n]or speculation' suffices to defeat summary judgment." Id. (quoting Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)). See also Blank v. Investec Ernst & Co., No. 02 CV 3260, 2004 WL 2725138, at *5 (S.D.N.Y. Nov. 29, 2004) (granting summary judgment where the plaintiff had undergone a recent psychiatric evaluation which concluded that she did not "show the expected difficulties in concentration which an attention deficit disorder person might have" and where her own description of her difficulties did not extend beyond "general descriptions"); cf. Ristrom v. Asbestos Workers Local 34 Joint Apprentice Committee, 370 F.3d 763, 766-68 (8th Cir. 2004) (discussing the fact that the plaintiff had presented two medical evaluations but neither explicitly diagnosed him with ADHD: the first reported that he did not display "noteworthy deficits" on "tasks sensitive to inattention or concentration difficulties," and the second found merely that the plaintiff's test results were "congruent" with a "preliminary" diagnosis of ADHD).

Here, as discussed above, the sworn statements of plaintiff and his physician go well beyond the bare diagnosis described in DeMar. Like the plaintiff in Garcia v. State University of New York Health Sciences Center, No. 97 CV 4189, 2000 WL 1469551 (E.D.N.Y. Aug. 21, 2000), plaintiff's medical diagnosis in this case is clear; two physicians have rendered a diagnosis that he has ADHD and the condition imposes "very real and observable" limitations on his abilities. (Giantinoto Aff. ¶ 9). In Garcia, the court denied summary judgment where the plaintiff had presented a detailed ADHD diagnosis, based on testing performed by plaintiff's physicians. The court found that the plaintiff, "although possessed of a high native intelligence, a

well-developed vocabulary, and strong abstract reasoning skills, has considerable difficulty with his reading speed and comprehension, his organization, and his attention to detail." Id. at *6.

Defendant further argues that plaintiff's claim of a disability is undermined because his ADHD was mitigated by Adderall. See Calef v. Gillette Co., 322 F.3d 75, 84-85 (1st Cir. 2003) (granting summary judgment and finding no disability where medication had "helped control most of the effects of ADHD," and test results indicated that the plaintiff's "learning ability was in the average range"); Wright v. CompUSA, 352 F.3d 472 (1st Cir. 2003) (granting summary judgment where the plaintiff's treatment "had been quite successful").[28] However, Dr. Giantinoto states that Adderall had merely been "of some benefit" to plaintiff, but that even when using Adderall, he still needed "much more effort to learn or recite new information." (Giantinoto Letter). Indeed, the evidence put forth by the plaintiff relates to his abilities while he was taking Adderall, demonstrating that his problems were not fully alleviated or controlled by the medication. Thus, the extent to which the Adderall was helping him is immaterial.[29] See Garcia v. State University of New York Health Sciences Center, 2000 WL 1469551, at *6-8 (noting evidence that the plaintiff "receives only limited benefits from Ritalin").

Defendant also relies on the much-cited case of Davidson v. Midelfort Clinic, 133 F.3d 499 (7th Cir. 1998). There, the plaintiff, a practicing psychologist, had been diagnosed with ADHD at an early age. See id. at 502. She filed suit against her employer claiming that she had

---

[28]Under the new rule established by the ADA Amendments, the Court would be prohibited from considering corrective measures, such as the use of Adderall, in the determination of whether plaintiff is disabled. See note 26 supra.

[29]It should be noted that the LIRR rules prohibit the use of Adderall. Thus, whatever difficulties plaintiff described in passing the Practical Examination while he was actually taking Adderall most likely would be exacerbated if he were taking the Examination without medication.

been discriminated against and eventually terminated for discriminatory reasons as a result of her disability. Id. at 504. In urging the court to find that she was disabled for purposes of the ADA, plaintiff described a series of difficulties experienced as a result of her ADHD, including various obstacles she had encountered in the course of her education, which she had "managed to circumnavigate" through hard work and adaptive techniques. Id. at 502-03. During the course of her employment as a psychologist with the defendant, the plaintiff encountered difficulty recording notes on her patients, which she was required to do orally for transcription by other staff members. Id. at 503. Her solution was to write out her notes before dictating them, which was a time-consuming process that her colleagues apparently did not find necessary, at least as evidenced by her supervisor's comment that "successful therapists do not need to write out their dictation." Id. at 503-04. Although the court ultimately concluded that due to her difficulties in school, the plaintiff had presented sufficient evidence that she had a record of a disability under 42 U.S.C. § 12102(2)(B), the court found that the plaintiff was not currently disabled because she had not demonstrated substantial limitations with respect to her ability to work, speak, or learn. Id. at 506-10.

Although Davidson presents certain similarities to the instant case, it is not controlling in this Circuit and it also demonstrates the difficulties faced by plaintiffs attempting to satisfy the pre-Amendment requirements for establishing disability. In reading that case, one wonders how exactly a plaintiff with ADHD could ever demonstrate that he or she is both substantially limited in a major life activity and otherwise qualified for a job of any significant complexity. In enacting the ADA, Congress made no distinctions between mental and physical impairments, nor is there any justification in the Act or in the Supreme Court cases interpreting the Act for denying

protection to individuals with conditions like ADHD. The recent ADA Amendments, in rejecting the reasoning of Toyota Motor Manufacturing, raise serious questions as to the continued viability of the type of approach taken in Davidson. The Court is bound to follow Toyota in this case despite its explicit rejection by Congress, but the findings and purposes articulated in the recent amendments to the ADA also cast doubt on the future viability of Davidson's reading of the original ADA and narrow application of Toyota.

Having considered all of the evidence presented by plaintiff, including the report of Dr. Giantinoto demonstrating that plaintiff has ADHD which has specifically affected his ability "to recite new information in an oral test setting," this Court concludes that plaintiff has presented the minimum amount of evidence necessary under the pre-Amendment standards to demonstrate an issue of fact as to whether he is disabled.

### 4) Otherwise Qualified

Plaintiff contends that he possesses the knowledge and skills to become a Signalman, but that he was unable to demonstrate this knowledge on an oral examination because of his ADHD. Plaintiff's argument that he was otherwise qualified for promotion is twofold. First, plaintiff argues that Dr. Giantinoto's affidavit establishes that he was "substantially limited in his ability to focus when being asked questions orally and in his ability to verbally relate information that he knew . . . [a difficulty] not uncommon with individuals who suffer ADHD." (Pl.'s Mem. at 7). Second, because "plaintiff has proven that he was able to pass every written examination given to him during his classroom training . . . along with the fact [that] there were never any complaints with respect to his job performance [as Assistant Signalman]," plaintiff was qualified for promotion. (Id.)

34

In response, defendant claims that plaintiff was not otherwise "qualified for the position of Signalman because he failed all four of his Practical Examinations." (Def.'s Mem. at 14). Following defendant's reasoning, plaintiff's performance during the training sessions and as an Assistant Signalman would not necessarily indicate his capacity for promotion. This is because the Practical Examination is designed to be a rigorous test of an Assistant Signalman's knowledge to ensure that he/she is ready to perform the tasks of a Signalman without assistance. According to one of Geoghan's supervisors, Gary Stawarz, examiners "don't really give a lot of room for error" on the Practical Examinations because after passing the test, the newly-certified Signalman could be called up to work "that night at midnight . . . on his own." (Stawarz Dep. at 97). The material covered on the test is "very safety sensitive," and misapplication of that material in the field could lead to disastrous consequences, including collisions between trains and automobiles. (Id.)

Plaintiff does not dispute that he failed to demonstrate sufficient knowledge of rules and procedures during his Practical Examinations. According to Stawarz, he failed to perform a number of critical tasks, such as dealing with voltage leakage, understanding electrical versus mechanical locking of levers, knowing how to actually throw a lever to move a rail switch, troubleshooting switch mechanisms, and tracing circuit diagrams. (Stawarz Dep. at 87-96). During these examinations, supervisors noted that plaintiff could not pass because of "too much variation[] on a few critical subjects," including "very safety-sensitive sections." (Id. at 90, 96).

Nevertheless, the evidence presented by defendant is not sufficient to remove all issues of material fact from the question of whether plaintiff was otherwise qualified to perform the job of a Signalman. The critical problem for defendant is that its argument is circular. Defendant

claims plaintiff was not qualified for promotion because he could not pass the Practical Examination (Def.'s Mem. at 14), but plaintiff and his physician attribute these failures to his ADHD (Pl.'s Mem. at 8), and defendant has not presented any evidence tending to demonstrate that the Practical Examination as it was given was the only reasonable method of evaluating plaintiff's readiness for promotion.

One of the accommodations plaintiff requested was that the oral portion of the exam be replaced with a written test. (Pl.'s Mem. at 8; Def.'s Mot. Ex. AA). Defendant argues that this request was unreasonable because the examination as it was given "is the best way to judge the Assistant Signalman's ability to perform in the field." (Def.'s Mem. at 20; see Def.'s Reply[30] at 10). Defendant, however, presents no evidence to support this conclusory allegation, and mischaracterizes plaintiff's request as a request "to turn this crucial field test into a sit down written exam." (Def.'s Reply at 10). In fact, plaintiff did not request that the field portion of the exam be replaced, only that the oral portion be replaced with a written exam. (See Pl.'s Mem. at 8). Plaintiff's request is supported by Stawarz's deposition testimony, which indicates that many of plaintiff's difficulties came on the oral portion of the exam that was not given in the field. In fact, on his first and last exams, he did not get an opportunity to go out into the field. (Stawarz Dep. at 90, 111).

Defendant also asserts that because plaintiff came up with the proposed accommodations on his own and without the endorsement of a doctor or other professional, the request was unreasonable. (Def.'s Mem. at 21). However, there is no provision in the ADA nor any court-

---

[30]Citations to "Def.'s Reply" refer to Defendant's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment, filed November 19, 2007.

imposed requirement that a plaintiff specify the rationale behind a proposed accommodation. The fact that plaintiff's proposed accommodation was based on Internet research and personal experience (Geoghan Dep. at 166-72) does not absolve defendant of the burden of affirmatively showing why plaintiff's requested accommodation was unreasonable. Whereas plaintiff presents his doctor's testimony and the results from the training course to corroborate his belief that with the requested accommodations, he could have qualified for promotion, defendant's evidence leaves these claims unrefuted.

In short, plaintiff argues that the Examination prevented him from demonstrating his qualifications for promotion, and that because of his disability, it did not accurately test his knowledge of the subject matter. Since the Practical Examination is alleged to be discriminatory, defendant cannot simply rely on the results of the examinations alone to show that plaintiff could not perform the duties of a higher position. Accordingly, the Court finds that the evidence set forth by plaintiff could demonstrate to a jury that he was otherwise qualified to perform the duties of a Signalman had he been given a testing accommodation. Defendant does not submit sufficient evidence to foreclose all material issues of fact in this element of plaintiff's claim.

   5) Adverse Employment Action/Failure to Accommodate

Having established that plaintiff has made a *prima facie* showing that he is disabled and is otherwise qualified for promotion, the Court now addresses the question of whether or not plaintiff suffered an adverse employment action as a result of his disabilities. There is no dispute that plaintiff suffered an adverse employment action when he was terminated. (Def.'s Mem. at 15). However, defendant argues that the termination was wholly unrelated to plaintiff's hearing loss and ADHD – that plaintiff was fired solely because he could not pass the Practical

37

Examination within the four-year time period. (Def.'s Mem. at 22).

The Court agrees with defendant that plaintiff does not submit sufficient evidence to demonstrate that his termination was in any way related to his hearing impairment. The LIRR allowed plaintiff to wear his hearing aids during his employment as an Assistant Signalman and during his Practical Examinations (Geoghan Dep. at 134), and there is no suggestion that defendant considered plaintiff's hearing loss to be problematic.

Indeed, plaintiff's reasonable accommodation request pertains almost entirely to addressing problems related to ADHD, not hearing loss. For instance, plaintiff maintains that he should have been able "to take written qualifying tests followed by practical examinations in the field." (Pl.'s Mem. at 8). Plaintiff evidently did not foresee any difficulties completing tests in the field as a result of his hearing. The Court further notes that plaintiff does not even mention his hearing impediment in the memorandum of law submitted in opposition to defendant's summary judgment motion. Plaintiff does not provide any specific facts showing that his hearing impeded his performance on the Practical Examination. Accordingly, the Court finds that plaintiff fails to demonstrate that he suffered any adverse employment action because of hearing loss.

However, plaintiff presents sufficient evidence to support his position that the multiple examination failures were due in whole or in large part to his ADHD. In addition to his own testimony about his difficulty communicating during the Practical Examinations (Geoghan Aff. ¶ 13), plaintiff submits the opinion of his physician, Dr. Giantinoto, as confirmation that his inability to verbalize answers properly was a result of his ADHD. (Giantinoto Aff. ¶¶ 9). While defendant argues that plaintiff "fails to offer admissible medical evidence that he was diagnosed

38

with ADHD" (Def.'s Mem. at 9), defendant has advanced no argument that the opinions of Dr. Levine and Dr. Giantinoto are inadmissible or should be otherwise discounted. Therefore, the Court must take their diagnoses and opinions as accurate on this motion for summary judgment, and the Court finds that plaintiff has met his burden of showing an adverse employment action as a result of his ADHD. Plaintiff has provided affirmative evidence that he suffers from ADHD, and that the ADHD significantly inhibited his ability to respond to oral questions on the Practical Examination. A reasonable jury could find that plaintiff's inability to pass the Practical Examination was the result of plaintiff's ADHD; plaintiff thus satisfies his burden of showing a causal relationship between his disability and the adverse employment action.

Regarding plaintiff's failure to accommodate claim, defendant argues that it should fail because the plaintiff did not request an accommodation until after he failed the Practical Examination for the fourth time. Plaintiff's request for accommodations included a request for more time, and while the timing of the request is relevant to the question of whether or not it was reasonable, as well as to the question of pretext, as described below, it is insufficient to defeat plaintiff's *prima facie* case.

Plaintiff has thus shown all elements of a *prima facie* ADA case. He has demonstrated sufficient evidence that he had a disability (ADHD) during the relevant time period, was otherwise qualified to perform the job of a Signalman, and suffered an adverse employment action as a result of his ADHD.

6) Non-Discriminatory Rationale for Termination

Having established that plaintiff has made out a *prima facie* case of discrimination, defendant has the burden of proffering a legitimate non-discriminatory reason for plaintiff's

termination and the failure to provide him the requested accommodation. See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, 198 F.3d at 72. Defendant asserts that "[p]laintiff was terminated because he failed to qualify for promotion to the position of Signalman within four years of becoming an Assistant Signalman, as required by the CBA." (Def.'s Mem. at 16, 22). Multiple individuals, including plaintiff himself, testified that there was a four-year time limit during which an Assistant Signalman had to pass the Practical Examination and be promoted to Signalman, or face termination. (See, e.g., Geoghan Aff. ¶ 10; 56.1 Stmnts ¶ 97; Chirillo Aff.[31] ¶ 12; Asst. Signalman Job Spec. at 1).[32] The LIRR contends that this time limit ran for four years beginning on the date plaintiff was promoted to the position of Assistant Signalman (56.1 Stmnts ¶ 97), which was January 19, 2001. (Id. ¶ 78). The LIRR claims that plaintiff's termination on February 15, 2005 was merely enforcement of this up-or-out promotion scheme. (Def.'s Mem. at 16). By ascribing plaintiff's termination— and by implication the refusal to grant him his requested accommodation—to a neutral and generally applicable promotion scheme, the LIRR meets its burden of offering a legitimate, non-retaliatory reason for plaintiff's termination. See Dalton v. Subaru-Isuzu Auto., 141 F.3d 667, 679 (7th Cir. 1998) (noting that an employer may lawfully "enforce an 'up-or-out' policy of the

---

[31]Citations to "Chirillo Aff." refer to the Affidavit of Michael D. Chirillo annexed to defendant's Motion for Summary Judgment, filed September 13, 2007.

[32]The CBA does not appear to explicitly require termination of an individual who fails to qualify in four years, only that the individual "shall forfeit all seniority rights in the assistant signalman class." (Def.'s Mot. Ex. BB). However, plaintiff apparently concedes that the LIRR followed an up-or-out policy. He produces no evidence to the contrary, and although his response to defendant's Rule 56.1 statement denies paragraph 97, which is a description of the up-or-out policy, a flat denial without citation to admissible evidence is deemed an admission for purposes of this motion. See Local Civil Rule 56.1; supra at 12-14.

sort practiced by many universities, management consultancies, law firms, and other covered

entities, under which employees who do not advance within the organization at a certain rate are

terminated").

7) Pretext

Having proffered a legitimate rationale, it then falls once again to plaintiff to demonstrate

that the legitimate reasons offered by the defendant were "merely a pretext for discrimination."

Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, 198

F.3d at 72. More specifically, plaintiff must show that discrimination "was a substantial reason

for the adverse employment action." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d

Cir. 2005). The burden for plaintiff is higher than that which applied for analyzing the *prima*

*facie* case; a plaintiff must demonstrate "'a sufficient basis for a trier of fact to doubt the

persuasiveness of [the employer's] proffered evidence and ultimately to find that the [legitimate,

non-discriminatory] reasons offered by [the employer] . . . were pretextual.'" Id. (quoting Quinn

v. Green Tree Credit Corp., 159 F.3d at 770) (omission in original). Clarifying the standard for

examining claims of pretext in adverse employment actions, the Second Circuit recently

established:

> A plaintiff alleging that an employment decision was motivated
> both by legitimate and illegitimate reasons may establish that the
> "impermissible factor was a motivating factor, without proving that
> the employer's proffered explanation was not some part of the
> employer's motivation."

Holcomb v. Iona Coll., 521 F.3d 130, 142 (2d Cir. 2008) (quoting Fields v. N.Y. State Office of

Mental Retardation & Developmental Disabilities, 115 F.3d 116, 120 (2d Cir. 1997)). In this

case, plaintiff need not prove that the four-year time limit played no role in his termination, only

that his disability was "a motivating factor" in his termination. However, it is well-settled that plaintiff must produce admissible evidence in support of his case. "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

Plaintiff's evidence of pretext comes primarily from the proximity of his accommodation request to his termination. It is undisputed that the LIRR terminated plaintiff six days after he filed his request. (56.1 Stmnts ¶¶ 231, 236, 240). In plaintiff's opinion, the short amount of time that elapsed between plaintiff's request to the LIRR for an accommodation and his termination suggests discriminatory intent—namely, that the LIRR did not want to deal with accommodating an individual with ADHD. (See Pl.'s Mem. at 11-14). Defendant calls this attempt to infer discriminatory intent "beyond brazen," noting that "[t]he timing can only be said to be 'coincidental' because Plaintiff *deliberately decided to wait* until the entire four year period of the CBA's 'up-or-out' policy had run [before requesting an accommodation]." (Def.'s Reply at 7).

This explanation, however, fails to remove all issues of material fact from plaintiff's discrimination claim. There are several inconsistencies in the sequence of events preceding plaintiff's termination that could allow a rational trier of fact to find in plaintiff's favor. Most importantly, defendant does not present any evidence to explain why the LIRR waited nearly a month after the apparent expiration of plaintiff's four-year time limit to terminate him. As the LIRR describes its up-or-out policy, the plaintiff could have been terminated as early as January 19, 2005 (four years after he was promoted to the position of Assistant Signalman). (56.1 Stmnts

42

¶ 78). Yet, between January 19, 2005 and February 15, 2005 (the date of plaintiff's termination), plaintiff was not terminated and instead was permitted to do all of the following:

- Take a fourth Practical Examination on February 1, 2005. (56.1 Stmnts ¶ 222; Def.'s Mot. Ex. Q).

- Continue to work until submitting his request for an accommodation on February 9, 2005. (Geoghan Dep. at 151-52).

- Following his accommodation request, discuss with the LIRR's head physician ending his use of Adderall and returning to work. (Geoghan Aff. ¶ 27-29).

If, as defendant contends, plaintiff's termination was a matter of course pursuant to the provisions of the CBA, then why was plaintiff permitted to do all of the above after the expiration of the time limit for promotion?

This inconsistency between defendant's non-discriminatory explanation and the actual chain of events is sufficient to create a genuine issue of material fact as to whether discriminatory intent was a substantial factor in plaintiff's termination. While defendant makes a compelling case that plaintiff was terminated solely on the basis of the CBA provisions, the extremely short six-day period between the reasonable accommodation request and the termination could also suggest that the LIRR used the CBA provisions as pretext to avoid addressing the request and dealing with an employee diagnosed with ADHD, particularly when viewed in light of defendant's failure to enforce the up-or-out policy for close to 30 days. In a motion for summary judgment, it would be improper for the Court to decide which of these interpretations of the evidence to credit.

Plaintiff submits several additional pieces of evidence that bolster his claim. First, plaintiff asserts that defendant did not respond at all to plaintiff's accommodation request after it

was filed. (Pl.'s Mem. at 10). In discussing what is expected of employers dealing with ADA requests for reasonable accommodation, the Second Circuit has held that "'[t]he ADA envisions an "interactive process" by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated.'" Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d at 218 (quoting Jackan v. N.Y. State Dep't of Labor, 205 F.3d 562, 566 (2d Cir. 2000)). Engaging in an interactive process might include "'meet[ing] with the employee who requests an accommodation, request[ing] information about the condition and what limitations the employee has, ask[ing] the employee what he or she specifically wants, show[ing] some sign of having considered the employee's request, and offer[ing] and discuss[ing] available alternatives when the request is too burdensome.'" Id. at 219 (quoting Taylor v. Phoenixville Sch. Dist., 174 F.3d 142, 162 (3d Cir. 1999)) (alterations in original).

The question of whether defendant had a duty to engage in this interactive process is muddled in this case, since defendant claims that plaintiff was already out of time when he filed the reasonable accommodation request. (Def.'s Mem. at 19). In essence, the LIRR argues that plaintiff had already been fired on non-discriminatory grounds (the four-year time limit) prior to the accommodation request. (Id.) In support of its argument, the LIRR cites Brown v. University of Cincinnati, No. 04 CV 164, 2005 WL 1324885 (S.D. Ohio Jun. 3, 2005), a case in which a student's request for accommodation was found to be untimely because:

> Plaintiff did not inform [the medical school] of his request for an accommodation until after his appearance before the Academic Appeals Board . . . , after he had finished his OB/GYN clerkship, after he had failed that clerkship, and more than a month after his dismissal based on failure of the clerkship had already been recommended by the Promotion Board.

44

Id. at *12.

There are, however, several critical differences between the case at hand and Brown. To begin with, the LIRR has submitted no evidence to demonstrate that plaintiff was in the midst of ongoing termination procedures, as was the case in Brown. See id. As plaintiff argues, even if the LIRR had the right to terminate him as of February 1, 2005, a "reasonable jury could conclude that the LIRR generally failed to enforce its up-or-out policy" because plaintiff was not terminated until February 15, 2005—six days after the filing of the reasonable accommodation request. (Pl.'s Mem. at 11). By all indications, plaintiff was still employed by the LIRR when he made his ADA request. Plaintiff continued to go to work after his February 1, 2005 Practical Examination, and he was engaged in ongoing discussions with the LIRR's head physician as to his Adderall use. (Geoghan Dep. at 152; Geoghan Aff. ¶¶ 27-29).

Furthermore, defendant did not even contact plaintiff to say that his accommodation request would not be accepted because the time limit for promotion had expired; defendant fired plaintiff without explanation as to the disposition of his ADA request. A reasonable jury could conclude that defendant's inaction provides supporting evidence for the theory that discrimination played a substantial role in plaintiff's termination.

Second, a jury could also reasonably conclude that the LIRR was premature in terminating plaintiff because plaintiff's sick-leave extended the time to qualify for a promotion. Plaintiff admits that he knew about the four-year time limit to pass the Practical Examination (Geoghan Aff. ¶ 10), but asserts that he was under the impression that sick-leave would extend the time to qualify. (Id.; Geoghan Dep. 149-50). More specifically, plaintiff asserts that "being sick I was told the sick time that you had got added onto the end of the time [to qualify for

45

promotion] so . . . I should have had two months left [after taking the fourth Practical Examination]."[33] (Geoghan Dep. at 150; see also Geoghan Aff. ¶ 10).

Although the portions of the CBA provided to the Court do not discuss the issue of sick-leave specifically, the language could be understood to support plaintiff's interpretation. According to defendant, Rule 30 of the CBA sets forth the four-year time limit for an Assistant Signalman to qualify for promotion. (56.1 Stmnts ¶¶ 96-97). Rule 30, in relevant part, reads as follows:

> (a) An assistant signalman at the expiration of his eight basic training periods of 130 eight-hour days of service each, overtime excluded, shall be promoted in the order of his completion of training to a position of mechanic, provided there is an advertised position which cannot be filled by a previously qualified mechanic in accordance with the provisions of this Agreement.

---

[33]Plaintiff states that he was informed of this policy by three individuals whom he was able to identify only as a LIRR foreman, a LIRR supervisor, and an individual from the Union. (Geoghan Dep. at 150). The Court may not rely on statements by these unnamed individuals because they constitute inadmissible hearsay. See, e.g., Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004) (noting that inadmissible statements in affidavits submitted in support of a summary judgment motion are incapable of raising material issues of fact); see also Rockport Co. v. Deer Stags, Inc., 65 F. Supp. 2d 189, 191 (S.D.N.Y. 1999) (finding that a court may strike portions of an affidavit containing inadmissible hearsay). It is possible that plaintiff could attempt to offer the statements of the foreman and supervisor as nonhearsay party admissions, but because plaintiff seeks to rely on statements made by unidentified supervisors without providing any information regarding the circumstances in which they were made, "it is impossible to tell whether the statements concern matters within the scope of their employment" and thus whether the supervisors were agents of the defendant for purposes of the hearsay rule. Evans v. Port Auth. of N.Y. & N.J., 192 F. Supp. 2d 247, 264-65 & n.129 (S.D.N.Y. 2002); cf. Lipton v. County of Orange, 315 F. Supp. 2d 434, 450 (S.D.N.Y. 2004) (holding that statements made by unnamed police officers carrying out a prisoner transfer were admissible when offered by the prisoner as evidence of the reasons the transfer was made). Nevertheless, plaintiff remains free to testify to his own understanding of the up-or-out policy even though his statement explaining the basis for his understanding is inadmissible. In the context of his motion for summary judgment where there is a noticeable absence of any contrary evidence regarding the LIRR's policy with respect to such leave time, the Court must credit his testimony.

. . . .

> (c) An assistant signalman who fails to qualify for
> promotion to the mechanic class after completion of his eight basic
> training periods of 130 eight-hour days each, overtime excluded,
> shall forfeit all seniority rights in the assistant signalman class.

(Id. ¶ 96; Def.'s Mot. Ex. BB). The language of this section states that promotion follows completion of a certain number of *days of service*. (Id.) Although the agreement specifies that overtime is excluded, it is silent as to whether a sick-day is considered a day of service. (Id.) Thus, based on the text of the agreement, plaintiff's understanding that he still had time to qualify for promotion when he was terminated is plausible. (See Geoghan Dep. at 149-50).

Defendant did not present any witnesses or evidence to clarify whether plaintiff's understanding of sick-leave days versus service days is correct. Gary Stawarz, for example, an engineer who helped administer plaintiff's Practical Examinations, was asked during his deposition whether the four-year time limit was ever extended, but he did not know. (Stawarz Dep. at 112-13). Resolving the ambiguity in favor of the non-moving party, plaintiff's interpretation of the time limit provides further evidence of pretext; a jury could find that the LIRR improperly shortened plaintiff's time to qualify in order to avoid dealing with the accommodation request and an individual with ADHD.

Third, plaintiff presents a statement from Chief Engineer Raymond Freiberger as evidence of pretext. According to plaintiff, within three months of being employed by the LIRR, Freiberger told him that "you are never going to be qualified [for promotion] if I have anything to do with it." (Geoghan Aff. ¶ 8). Defendant contends that Freiberger's statement is hearsay. (Def.'s Reply at 8). However, plaintiff offers Freiberger's statement as evidence of Freiberger's state of mind and not for the truth of the matter asserted. The statement, therefore, is not hearsay.

47

See Fed. R. Evid. 801(c); Evans v. Port Auth. of N.Y. & N.J., 192 F. Supp. 2d at 262. Moreover, even if it were offered for its truth, it may also be excluded from the hearsay definition as an admission by a party-opponent. Under Rule 801, a statement offered by a plaintiff is not considered hearsay where it is made by an "agent or servant [of the defendant] concerning a matter within the scope of the agency or employment." Fed. R. Evid. (d)(2)(D). Since Freiberger, a "Principal Engineer" for the LIRR, signed the letter notifying plaintiff of his termination (Def.'s Mot. Ex. CC), signed earlier letters warning plaintiff of his need to make additional progress in order to achieve a promotion, and was identified by Stawarz as an individual with knowledge about how strictly the up-or-out policy was implemented (Def.'s Mot. Exs. J, L; Stawarz Dep. 112-13), plaintiff has provided substantial evidence that Freiberger had sufficient decision-making and supervisory authority over plaintiff's employment status for his statement to be considered a party admission. See Evans v. Port Auth. of N.Y. & N.J., 192 F. Supp. 2d at 262.

Defendant also argues that because Freiberger's alleged statement came before plaintiff informed anyone at the LIRR of his ADHD, it cannot be used to suggest that plaintiff was dismissed because of his request for an accommodation. (See Def.'s Reply at 8). The significance and credibility of plaintiff's allegation, however, are for a jury to determine.

The unresolved questions about the timing of plaintiff's termination, the possibility of sick-leave extension, and the statement allegedly made by Freiberger, are sufficient evidence of pretext for plaintiff's claim of discrimination based on his ADHD to survive summary judgment.

Accordingly, defendant's motion for summary judgment as to the ADA discrimination claim is granted with respect to plaintiff's hearing loss and denied with respect to ADHD.

D. ADA Retaliation

In addition to making a claim of discrimination, plaintiff alleges that the LIRR violated the retaliatory discharge provision of the ADA by terminating him for filing a request for a reasonable accommodation. (Compl. ¶ 36). The ADA prohibits an employer from discriminating against an individual because "such individual has opposed any act or practice made unlawful by this [Act] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [Act]." 42 U.S.C. § 12203(a). A claim of retaliation under the ADA is thus treated separately from a claim of discrimination, and a plaintiff need not show that he or she has a disability to make out a retaliation claim. See, e.g., Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999).

Although defendant moves to dismiss plaintiff's Complaint in its entirety (Def.'s Mem. at 1), it does not address the retaliation claim in its briefing papers, and plaintiff does not address the claim either. The Court, therefore, denies summary judgment on the retaliation claim.[34]


E. The Rehabilitation Act and NYSHRL

In addition to filing a claim under the ADA, plaintiff also brought disability discrimination claims under the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq., and the Rehabilitation Act, 29 U.S.C. §§ 701 et seq. (Compl. at 1). The standards applied

---

[34]Although it appears that plaintiff may have intended to state a claim of retaliation under the Rehabilitation Act as well, such a claim is not properly stated in his Complaint. (See Compl. ¶ 55).

under these two acts are substantially the same as those applied under the ADA;[35] therefore, the

Court's analysis under the ADA applies to these claims as well. See 29 U.S.C. § 794(d); Stone

v. City of Mount Vernon, 118 F.3d 92, 96-97 (2d Cir. 1997) (noting that the standards under the

ADA and Rehabilitation Act are the same); DaPonte v. Manfredi Motors, 335 F. Supp. 2d 352,

357 (E.D.N.Y. 2004) (noting that "'[t]he legal standards for discrimination claims under the

ADA and under New York state . . . law are essentially the same, except to the extent that the

New York statute[] support[s] a broader definition of "disability"'") (quoting Woolley v.

Broadview Networks, No. 01 CV 2526, 2003 WL 554754, at *8 (S.D.N.Y. Feb. 26, 2003));

Burton v. Metro. Transp. Auth., 244 F. Supp. 2d 252, 257-58 (S.D.N.Y. 2003). Accordingly,

defendant's motion for summary judgment on the NYSHRL and Rehabilitation Act claims is

denied.


F.  Cut-Off for Damages

Defendant argues that even if plaintiff can demonstrate that his discharge was

discriminatory, any economic damages he may be entitled to should be cut off as of February 26,

2007, the date of his deposition. (Def.'s Mem. at 23-24). The LIRR alleges that it would have

discharged him anyway due to "application fraud" after it discovered during his deposition that

he had failed to disclose on a medical history record that he had been diagnosed in the past as

"hyperactive." (Id.) Plaintiff, who did not respond to this argument in his opposition papers, is

---

[35]Although the NYSHRL differs from the ADA in that its definition of disability is significantly broader, this difference is immaterial to this motion since the Court finds that plaintiff has presented sufficient evidence to raise a question of fact as to whether he is disabled under the ADA.

directed to respond on or before April 30, 2009.

## CONCLUSION

Defendant's motion for summary judgment is granted with respect to plaintiff's claims of discrimination on the basis of hearing impairment under the ADA, Rehabilitation Act, and NYSHRL. However, the motion is denied with respect to plaintiff's claim of discrimination under the ADA, Rehabilitation Act, and NYSHRL on the basis of ADHD, as well as his claim of retaliation under the ADA. Plaintiff is directed to file a response to defendant's argument regarding a cut-off of damages on or before April 30, 2009.

**SO ORDERED.**

Dated: Brooklyn, New York
April 9, 2009

Cheryl L. Pollak
United States Magistrate Judge